### H. BLUM v. T. S. ROGERS.

No. 3180.

**Urban Homestead—Abandonment.**—When a town or city homestead is practically divided, and a detached part or parts are improved with buildings and other appurtenances which are neither necessary to nor intended for the convenience of the · family, and are evidently held for the purpose of being leased, an unimportant subsidiary use of such property for household purposes will not protect the lots so improved from forced sale; the lots not so appropriated possessing every convenience of a comfortable home.    See facts.

APPEAL from Hopkins.    Tried below before Hon. E. W. Terhune. The opinion gives the facts.

*Scott & Levi* and *Cranford & Garrison,* for appellant.—The verdict and judgment are contrary to the evidence and the great weight thereof, and the charge of the court thereupon and the law and justice of the case, in this, that said lots being disconnected from the dwelling place and separated from it were not so used as to make them a part of the home of Rogers and wife, nor were the uses thereof by Rogers and wife of such a character as to show that said property was in good faith used for the purposes of a home, or in such a manner as contributed in fact to the enjoyment and comfort of a home; and under the charge of the court in this regard said verdict should have been for this defendant for three-eighths of said lots.    Stringer v. Swenson, 63 Texas, 7; Medlenka v. Downing, 59 Texas, 32; Hudson v. Wynne, 66 Texas, 1; Fort v. Powell, 59 Texas, 321; McDonald v. Campbell, 57 Texas, 614; Blum v. Rogers, 71 Texas, 668; Effinger v. Oates, 61 Texas, 590; Gassoway v. White, 70 Texas, 475.

*H. McKay, J. H. Dinsmore* and *A. A. Henderson,* for appellee.—The evidence before the jury upon the trial and under the charge of the court, no objection being raised to the charge, is sufficient to support the verdict and judgment.

GAINES, ASSOCIATE JUSTICE.—This is the third appeal in this case. The opinion upon the first appeal was not reported.    That upon the second will be found in 71 Texas, 668.    The suit involves the title to certain lots in the town of Sulphur Springs which were sold under execution

against appellee and were bid in by appellant and conveyed to him by the sheriff.

Appellee and wife brought this suit to cancel the sheriff's deed, upon the grounds, first, that the property was paid for with the separate funds of the wife, and was in equity her separate estate; and second, that the lots sold and conveyed by the sheriff were a part of the homestead of plaintiffs. Since the last appeal Mrs. Rogers has died and appellee has appeared as executor of her will.

There was testimony tending to show that the purchase money of the parcel of land of which the lots in controversy are parts was $180, and that of this $100 were the separate funds of Mrs. Rogers. The balance of $80 was paid with funds of the community. Hence a verdict for the plaintiffs for the entire property must be sustained, if at all, upon the evidence offered to show that the lots were parts of the homestead of Rogers and his wife.

From appellant's brief we extract the following statement:

"Three of the lots sold lay in what was called the 'George acre.' The history of this 'acre,' as shown in evidence, is as follows: In 1871 T. S. Rogers, being then married to Mary Rogers, bought from W. S. Ferrill and wife an acre of land just east of and adjoining the George acre, and at the same time F. M. George, a relation of Rogers' wife, bought the George acre from Ferrill and wife, giving his note for $150, the purchase price. * * * Rogers built a house on his lot and moved into it, and by permission of George enclosed the latter's acre in the same premises as his (Rogers') own. Subsequently George orally agreed to let Rogers have the George acre if he, Rogers, would pay Ferrill the amount of George's note given for the purchase price. Rogers assented, and in January, 1882, paid Ferrill $100 on account of George's note, the money being derived from the sale of a horse belonging to Mary, wife of T. S. Rogers. Thereafter Rogers paid the balance of George's note to Ferrill, amounting, principal and interest, to $80, and January 1, 1874, George conveyed his acre to T. S. Rogers in consideration of $180, the amount so paid by Rogers to Ferrill.

"For the purpose of showing more clearly the premises levied on and those adjacent to them the following diagram will be useful:

"The premises designated as the Dinsmore, Lichtenstein, and Cranford lots were levied on and sold. No levy was made on the cow lot.

"In 1871 Rogers built his residence on the east acre and lived there ever afterwards. It contained three rooms nicely furnished, and a dining room, cooking room, hall, and portico. There was a garden and an ample cistern of water on this east acre, and servants' house. At the date of levy the George acre was separated from the acre on which Rogers' residence was by an alley, and was subdivided, as shown on the diagram, by fences. Dinsmore occupied the northern premises and Lichtenstein those adjoining on the south, and Kimberlin the most southerly of all the premises. All had families living with them on the premises. Each of these premises was fitted up for occupancy by families, had separate dwellings, cisterns, and privies, and opened into the alley on the east. The alley remained open until after the levy.

"Rogers rented these premises whenever he could get tenants for them.

The Dinsmore premises were first occupied in 1878 or 1879 by Ab. Rogers, a brother and employe of T. S. Rogers, who paid him a salary and furnished him with this residence for himself and family.   He occupied it a year or more.   From September, 1880, to April, 1882, it was rented by metes and bounds to Dinsmore, who kept house there with his family; and afterwards to a widow lady, and generally since.   The Lichtenstein premises were rented to Lichtenstein from the time it was built, in 1878 or 1879, until a year or two after the levy in 1882.   The Cranford premises were first rented in 1879 to Baker, then to Waller, then to Cern, then to Kimberlin, then to Cranford, then to Brown, the levy being made during Kimberlin's tenancy.   Rogers claimed that he reserved and used the privilege of using water from the cisterns on the rented premises, but subsequently testified that he made no such reservation in renting the Cranford lot; and Cranford testified that there was no reservation whatever in renting that lot to him.   The cistern at Rogers' residence was ample for his purposes, and if he ever used any water from the Dinsmore place, which was nearest to his residence, it was so occasionally that Dinsmore did not know it during the eighteen months that he occupied the place.   Rogers testified that he used water from one or the other of them every year.   He also claimed that while these lots were rented he cultivated gardens on them.   This was denied by Dinsmore, who himself cultivated the garden on his place.   He first rented the place for one year and afterwards without contract as to any specific time.   At some time between December 20, 1881, and March, 1882, Rogers purchased the vegetables planted by Dinsmore and growing on the Dinsmore lot on a part previously fenced off by Rogers at request and for convenience of Dinsmore.   At the time of purchasing the garden from Dinsmore Rogers also asked and obtained Dinsmore's permission to run a fence from north to south, cutting off a strip from the western part of Dinsmore's premises and making a way to a stable previously used by Dinsmore, but then and there appropriated by Rogers for the use of a stockman employed by him to keep his, the stockman's, horses in.   When rented these premises yielded an aggregate rent of from $30 to $37.50 per month, and they were rented pretty much all the time."

The following is the counter-statement from appellee's brief with reference to the use of the lots in controversy, and presents the case made by his own testimony in its most favorable aspect:

"The history of the acquisition by Rogers and wife of the George acre of land is correctly given by appellant in his brief.   The diagram of the George acre as given in appellant's brief is substantially as the lots were pointed out by Hunter to the sheriff as aforesaid.   The said acre was never divided into blocks as shown in said diagram by Rogers.   There never was any fixed lot or quantity of land laid off or enclosed by Rogers about any one of the houses on the George acre.   Said acre was at different times

subdivided by skeleton or movable fences, which fences were frequently moved by Rogers as his convenience and use of the property required. At different times Rogers enlarged the area about one house and reduced that about another. The two acres were enclosed in one enclosure but separated by a rail fence from the time that Rogers came into possession about 1871 until 1875 or 1876, when Rogers opened a 20-foot alley between the two lots for his own convenience and private use while using the George acre for cow and horse lots and garden, and afterwards kept the same open or closed at his convenience and pleasure. It never was a public way and is not now. In renting the three houses Rogers never rented the ground about the houses, except that for one year he permitted the tenant to use a part of one lot for a garden. Rogers used the grounds about the three houses on the George acre every year for his own purposes, i. e., gardens and horse and other lots, except in the one instance above mentioned."

The law of this case was announced in the opinion on the first appeal in the following language:

"This case resembles very much the case of Medlenka v. Downing, 59 Texas, 32, and the block of ground here described is much like the block of ground in that case. There the block lay east and west. Appellants had their dwelling on the east end, and at one time appear to have used the whole block as their homestead. They gave a deed of trust on the western part, which had been for some time fenced off from the dwelling and wholly disused in connection with it. The court held that as to this western part, which was not used for the purpose of a home, the deed was valid. But a garden which was used with the homestead was also included in the deed, and as to that the deed was held void. In the case before us Rogers owned two acres of ground in a block. On the eastern end was his dwelling, with everything that pertained to his home except his cow lot, which was on the western part of the block. The remainder of this western acre he cut up into three lots, and upon each one erected a dwelling house, with all the conveniences of a family residence, fencing each lot to itself and separating the whole western acre from the eastern by an alley twenty-two feet wide. For several years before the levy these houses were regularly rented whenever tenants could be found, and in fact were rarely vacant. It seems pretty clear that these lots had ceased to be used for the purposes of a home. His occasional resort to one of the cisterns for water by the permission of the tenant does not alter the case." Blum v. Rogers, Tyler Term, 1884, unreported.

We believe the principles laid down in the opinion from which we have quoted to be correct, and we have no disposition to disregard them. To protect lots in a town or city not actually occupied by the family residence or its appurtenances, they must be substantially used by the family for home purposes. When they are detached by enclosures from the homestead lot proper and are improved for the purpose of being leased to ten-

ants and of thereby producing an income, it is evident they are no longer used as adjuncts of the family residence and should be no longer exempt from forced sale. The mere fact that portions of the land may be occasionally used for a family purpose, such as to grow vegetables, to shelter live stock, or to furnish water, is not enough to shield it from sale under execution for the payment of the owner's debts. The principal use to which they are subjected must be looked to, and where, as evidently appears in this case, the main purpose to which the property is devoted is to bring in an income, and the family use is not only secondary and subordinate but of trivial importance, the property should be no longer deemed a part of the homestead. The beneficent provisions of our homestead laws have been the occasion of much enthusiastic comment and of not a few rhetorical flourishes in the opinions of this court. That it is politic and wise is proved by the tendency of all the more recent legislation upon the subject throughout the States of this Union. But while this court has ever construed and will continue to construe our exemption laws liberally in favor of those they were intended to protect, we can not sanction an interpretation which would make them a mere cover for shielding property from being subjected to the payment of honest debts. If a debtor who is the head of a family, and who has contiguous or near to his residence one or more lots which he does not desire to use as a part of his home and for the direct comfort and convenience of his family, may build houses upon them to be let to tenants and protect them from forced sale by occasionally drawing from them a supply of water or sowing the ground in turnips, a wise and humane provision of our organic law is made an instrument of wrong and a reproach among honest men.

We do not wish to be understood as holding that the mere renting of a part of the homestead will subject it to forced sale. But what we do hold is that when a town or city homestead is practically divided, and a part or parts are improved with buildings and other appurtenances which are neither necessary to nor intended for the convenience of the family, and they are evidently held for the purpose of being leased, an unimportant subsidiary use for household purposes will not protect the lots so improved from forced sale in a case like the present, where the lots not so appropriated possess every convenience of a comfortable home.

The court below should have granted a new trial, and because it failed to do so the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Delivered November 18, 1890.