William Hendrick v. Peter J. Hendrick.

No. 822.

**Homestead—Houses Built to Rent not Exempt.**

Where the head of a family erected on his homestead lot in a city several dwelling houses other than the one in which he lived, for the purpose of renting them for the revenue to be derived therefrom, such rented houses and the grounds occupied by them were not exempt from execution.

Appeal from Dallas. Tried below before Hon. Edward Gray.

*Dickson & Moroney*, for appellant.—To protect lots in a city not actually occupied by the family residence or its appurtenances, they must be substantially used by the family for home purposes. The principal use to which they are subjected must be looked to, and where the main purpose to which the property is devoted is to bring an income, and the family use is not only secondary and subordinate, but of trivial importance, the property should no longer be deemed a part of the homestead. Achilles v. Wilson, 81 Texas, 169, 171; Blum v. Rogers, 78 Texas, 530; Oppenheimer v. Fritter, 79 Texas, 99, 103; Houston v. Newsome, 82 Texas, 75.

*Coke & Coke*, for appellee.—Appellee being a married man, residing with his family upon the lot in question, owned by him, which lot was under one enclosure and of less value than five thousand dollars, acquired the whole of said lot as a homestead, and the houses thereon and the use made of them, under the circumstances in this case, did not prevent homestead rights attaching to the whole of said lot, and the character of said houses and use made of them, did not evidence an abandonment of homestead rights as to any part of said lot. Newton v. Calhoun, 68 Texas, 452; Rollins v. O'Ferral, 87 Texas, 92; Medlinke v. Downing, 59 Texas, 37; Blackburn v. Knight, 81 Texas, 336; Gallagher v. Keller, 87 Texas, 472.

NEILL, Associate Justice.—This suit was instituted on December 6, 1892, by appellant to recover on a judgment for $4748.56, which had theretofore been obtained in the Supreme Court of Suffolk County, Mass., by Eliza J. Hendrick against the appellee on personal service, which had been transferred by Eliza J. to appellant, and was still valid and subsisting. When this suit was brought, an attachment was issued and placed in the hands of the sheriff of Dallas County, who, on the 6th day of December, 1892, levied it upon the realty described in our conclusions of fact. In his answer the appellee plead that the property levied upon was his homestead, and therefore not subject to the levy. This

issue was tried before a jury, and was determined by a verdict in favor of appellee. Whereupon, the amount sued for being undisputed, judgment was rendered in favor of appellant for $5147, and in favor of appellee vacating and annulling the levy. This appeal is from the judgment on the issue of homestead, to which we will confine our statement of the facts.

The following plat correctly shows the location of the property in controversy, as well as house indicated by E and the ground immediately in the rear of it which was not levied on. All the houses indicated on the plat were placed on the lots by the appellee prior to his marriage, with the intention of renting them so as to raise money for him to live on in his old age:

The appellee bought this property in two separate parcels—the last portion, 80 by 125 feet, being lot 4, block 5, Crowdus and Akard's addition to the City of Dallas, from Alex. L. Bibb, on December 31, 1887, and the west part, 104½ by 169 feet, from E. L. Poindexter, on July 22, 1887. When the attachment was levied, there were on the property some houses indicated on the plat by A., B., C., D., E., F., and G. The Poindexter lot was unimproved when appellee purchased it, and the only improvement on the Bibb lot when bought was a small house of little value, which appellee afterwards repaired and finished, which house is indicated on the plat by C. The houses which were on the premises when the attachment was levied were bought by appellee at about $100 apiece, and moved on the lots and put in shape. In the rear of the large house, marked F., appellee dug a well, the only one on the premises, which was used by himself, his tenants and some of his neighbors. The appellee was married in 1889, and his wife and two children, one of whom was born since the writ was levied, constitute his family. When he was married, the improvements on the property were in the same condition as when the suit was instituted, except as to the fences. Then there was a fence on the east and south lines, and part of the way on the west line, but no cross fence of any sort, nor were there any trees on the property.

All the property has been continuously claimed by appellee as his homestead from the date of his marriage to the trial of this case. When married he was living in the house indicated on the plat by G., in which his marriage occurred. He lived there about six or eight months, then moved into house D., where he lived about the same length of time; from there he moved to house E., in which he was residing at the time this suit was instituted, where he continued to live until January 29, 1894, when all the houses except A. B., and C. were destroyed by fire, then he moved into house C., where he still resides. All of the houses are wooden, most of them being what are called box houses. The one indicated by A. is a two-story house, the lower part being all in one room, the upper part being divided into three. This house has a small kitchen back of it not shown on the plat. The other houses are of two or three rooms and kitchen, and on the lot in the rear of each is a privy, and there is a woodshed as shown on the plat. The 44 by 104½ feet in rear portion of Poindexter lot has always been used by appellee as a garden, horse and cow lot, and there is a barn on it, as shown by the plat. Appellee testified that his intention, after his marriage, always was to have the whole property as a homestead, and that he has continuously since then lived there and claimed it as such. He did not expect to live in any particular house, but would occupy a house, and if one was vacant, and a tenant preferred the one occupied by appellee to the vacant one, appellee would let the tenant have the one he was occupying. When appellee moved out of the houses, he did not intend to abandon them as part of his homestead. He never lived in the houses indicated as A., B., C.,

and F., they being rented and occupied by tenants; and the house A. has been occupied as a saloon ever since he owned it.

The plat, as drawn, shows the correct position of the improvements, except the house F. is about fifteen feet back from sidewalk. The others are three feet from sidewalk. Between houses A. and B. is a driveway with a double gate, and so, also, between houses G. and F.; when anything is hauled on the property, the wagon can go in at either gate and out at the other, or go in and out at the gates shown in the rear on the alley. There is a fence around the outside of the entire property, and the garden spots mentioned are also fenced to themselves. Beginning at the rear end of east side of house A. is a fence which runs back to the garden fence, but in this and in the fence on the west boundary line, there is an opening which generally is not closed, and is used by neighbors who come to the well for water. On the rear of the lot there are four partial fences running as shown on the map. They are lined with trees. When this suit was brought, appellee had a horse and cow, which were allowed to graze in the rear of the houses B., C., D., E., F., and G., and they could be brought into the lot from the cow lot through any of the gates in the cow lot or alley fence shown on the plat, and were brought in at any time appellee wished. He and his family used the lot in rear of the houses in common with his tenants, the tenants not having the right to the exclusive use of any part except the houses respectively rented by them. Appellee's family and his tenants got water from the well shown on the plat, there being no other source of water supply on the premises.

The opening in the fence running back from east corner of house A. was generally not closed, and his horse and cow could go on the lot in rear of house A. at will. House A. rented for $20 per month, and the other houses at about $8 or $9 each. The lots, exclusive of the improvements, were not worth more than $3000 when appellee married.

*Opinion.*—This statement of the evidence is from appellee's testimony, and is made in the light most favorable to him. But when the well-known object of the law in exempting and protecting a homestead from forced sale is considered, we must say that the verdict and judgment show that its beneficient purpose in this case has been abused. The issue was not whether a homestead existed on the premises at the date of the levy, for this was conceded by appellant; but the question was, what was its extent? This issue, and not whether the homestead or any part of it had been abandoned, should have been submitted. As intimated, to our minds it is clear that all the property designated on the plat was not, when this suit was instituted, appellee's homestead, and never had been. These seven houses on the premises, all suited for dwellings, and, with the exception of the one used as a saloon, occupied as dwellings, were placed there by appellee before his marriage, with the express intention of renting them all, save the one in which he might live, for the avowed purpose of raising a revenue to support him in his old age. This

intention did not change upon his marriage, but, as was testified to by himself and manifested by his acts, continued from that time until judgment was rendered. That he did not intend to use any particular house as his dwelling, but to yield possession even of the one he might be living in to a tenant, if desired, shows that he intended to subordinate his right to occupy any of them as his home to his original intention of renting the buildings to other parties. And yet he contends, because he had no more intention to occupy one house than another, but to adapt his occupancy to the desire and convenience of his tenants, that he can hold six dwelling houses and one saloon as a homestead, sacred from the touch of creditors. If he can, then it may well be said that homesteads under our law are shelters for fraud and not of families. To use the language of Mr. Justice Gaines, "We cannot sanction an interpretation of our exemption laws which would make them a mere cover for shielding property from being subjected to the payment of honest debts."

The evidence of the appellee himself establishes that the two-story house situated on the west end of the property has never been used or occupied as any part of the homestead, but that it has continuously been used as a saloon, to which use it is adapted, ever since it became the property of the appellee. It is also entirely segregated from the other property by a fence running back to the garden. That there was an "opening in the fence, generally not closed, through which appellee's cow could go on the lot at will" does not help his homestead claim; for, "to protect lots in a town or city not actually occupied by the family residence or appurtenances, they must be substantially used by the family for home purposes. When they are detached by enclosures from the homestead lot proper, and are improved for the purpose of being leased to tenants and of thereby producing an income, it is evident they are no longer used as adjuncts of the family residence, and should no longer be exempt from forced sale; and an unimportant subsidiary use for homestead purposes will not affect them." Blum v. Rodgers, 78 Texas, 535. Therefore, we take it that the trial court should have instructed the jury that it was established by the uncontradicted evidence that house A and the ground in the rear of it running back to the garden, was no part of apppellee's homestead, and as to it to find for appellant. What we have said as to this applies to all the other ground upon which the houses stood at the time of the levy, except that upon which the house was situated in which appellee lived at that time. There was evidence tending to show that the other parts of the property were of his homestead (Oppenheimer v. Fritter, 79 Texas, 103), and as to that, we would not disturb the verdict, did it not appear that there was no evidence to support it as to other property, as we have indicated.

Because the verdict as to part of the property is wholly unsupported by the evidence, and the error of the court in not granting a new trial on that ground, the judgment is reversed and the cause remanded.

Delivered March 4, 1896.                    *Reversed and remanded.*

Writ of error refused.