## SCHWARZER et ux. v. CALCASIEU LUMBER CO.

No. 9411.

Court of Civil Appeals of Texas. Austin.

Dec. 8, 1943.

Rehearing Overruled Dec. 31, 1943.

Emmett Shelton, of Austin, for appellants.

Hart & Brown and James P. Hart, all of Austin, for appellee.

McCLENDON, Chief Justice.

Appeal from a judgment upon a directed verdict in favor of Calcasieu (Calcasieu Lumber Company) and against Schwarzer and wife, foreclosing a trust deed lien upon Lot No. 2 in an Austin addition.

The sole issue the appeal presents is whether the evidence conclusively shows (1) that the lot was not in fact a part of the homestead of the Schwarzers at the time they executed the trust deed; or (if it does not so show) (2) that the Schwarzers were estopped from asserting its homestead character by reason of their representation in the trust deed that Lot No. 1 in said addition was their homestead, and that Lot No. 2 constituted no part of their homestead. The salient facts, substantially stated, follow:

The two lots faced south on 35 Street, Lot 1, a corner lot, adjoining Lot 2 on the west. Schwarzer purchased both lots February 9, 1929. At that time Lot 1 was unimproved. On Lot 2 was a two-family apartment house, divided vertically. It is sometimes referred to in the evidence as a "duplex." Technically it was what is termed a "double house," as a "duplex" is (technically speaking) divided horizontally (see 28 C.J.S. p. 58 "double house," and Id. p. 590 "duplex house"). However the technical nomenclature is unimportant. It was clearly an apartment house, built for two family occupation, and having two entrances. At the time of the purchase Schwarzer and his family, consisting of his wife and three children, a girl aged about one and two boys aged about two and six years, moved into the west apartment. The east apartment was rented and occupied by another family. Sometime in 1930, Schwarzer built a residence on Lot 1. This house was about 10 feet distant from the west side of the apartment house and faced south on 35th Street. It was numbered 406 and the apartment 404 West 35th Street. The two lots were not separated by fence. Upon completion of this residence, the Schwarzers bought new furniture for it (leaving their old furniture in the apartment house), moved into it (except that the oldest son, then about seven, occupied a room in the apartment house—a subject later discussed), and have continuously since that date occupied it as their residence. The trust deed was executed and acknowledged by both Schwarzer and wife October 15, 1935, and was given to secure a note, also sued upon, for the principal sum of $5,000. That sum was at the time paid by check of Calcasieu in favor of Schwarzer, cashed by him, deposited to his credit in bank, and used by him in his business as building contractor. The trust deed contained the above representation, which was believed and acted upon by R. G. Mueller, general manager of Calcasieu, and its sole representative in the transaction.

The Schwarzers' claim of homestead is predicated upon the following theory, substantially stated: When they built the residence on Lot 1 and moved into it, they had the intention (not, however, communicated to Mueller or any one else) to join it onto the apartment so as to make the two buildings one large house, whenever they should have the money; which, however, they never thereafter had. The oldest boy retained a room in the apartment. They also had a garden and fruit trees on the property; and used one side of a garage, situated on the rear end of Lot 2, to store an automobile. They did not move their furniture from the west apartment. The homestead character of Lot 2 was therefore never abandoned. That Calcasieu was not estopped by the representation, is predicated upon testimony of Schwarzer that he told Mueller that the oldest boy was occupying one room in the apartment house.

The evidence upon the issue of the oldest boy's having a room in the apartment house is supported by the testimony of Schwarzer and wife alone. It is in many respects vague and uncertain. It does show clearly, however, that the entire apartment house was used as far as possible for revenue purposes from the time they moved into the residence on Lot 1 in 1930 until the trial in 1943; that it was never vacant except when they couldn't get tenants; that the boy only occupied a vacant room, and moved from room to room in one or the other apartment in accordance with the tenant occupancy, and at times shared a room with a tenant, when a vacant room was not available. The tenants rented by the month, or by the week, and sometimes rooms were rented when other tenants were not available.

■ We are of the view that the evidence, viewed most strongly in favor of the Schwarzers, probably shows abandonment of Lot 2 as a matter of law. However, we find it unnecessary to rest our decision upon that holding, since clearly, we think, the Schwarzers are estopped from asserting its homestead character by their representations in the trust deed, which constituted the basis of the loan. The Schwarzers rely most strongly upon the cases of Scottish A. M. Co. v. Milner, Tex.Civ.App., 30 S.W.2d 582 (error refused); Budde v. Drawhorn, Tex.Civ.App., 110 S.W.2d 929; and Shamburger v. Delavan, Tex.Civ.App., 106 S.W.2d 351, in support of their theory of nonabandonment. None of these cases involved the issue of estoppel. In Milner's case, he purchased a lot in Mt. Pleasant, December 4, 1926, upon which were two residence houses, eight feet apart. One of these houses (the smaller with four rooms 14x14 feet each) was then occupied by a tenant, and Milner moved into the other house. His intention was to connect the two houses and make

one residence of them, and operate a rooming house. Before he could make his arrangements to that end, however, writ of attachment was levied on the property on March 14, 1927 (a little over three months after his purchase). The holding was that the evidence would support a finding that the homestead character attached to the entire property from the date of his purchase, and there had been no unreasonable delay in carrying out his intention of occupying the rented (smaller) house for homestead purposes.

The Budde case involved the issue of abandonment as to a garage situated on the homestead lot. An old garage was torn down and a new one built, the upper story of which was fitted out as apartments. The entire lower story was used exclusively by the family to store their automobile and other possessions.

The Shamburger case has no material bearing upon the case at bar. The issue there was whether a tourist camp, used as a family residence, and in which the family also conducted a tourist camp, constituted the business as well as the residence homestead of the family.

■ The principle which controls the issue of estoppel (independently of the issue of abandonment in fact) may be thus briefly stated: where the physical facts are such as to warrant a conclusion that the property in issue is not the homestead of the mortgagor, the mortgagee, in making the loan, may rely upon the representations (made for that purpose) of the mortgagor (here both the husband and wife), that the mortgage property is not homestead, and the mortgagor will be thereby estopped from asserting its homestead character in derogation of the mortgage. There are many Texas adjudications supporting this principle. We cite only two of them from this court which cite a number among the many which might be cited. Llewellyn v. First Nat. Bank, Tex.Civ.App., 265 S.W. 222, and Wootton v. Jones, Tex.Civ.App., 286 S.W. 680. A review of the decisions upon a principle so well established as to be now elementary in Texas jurisprudence, we think unnecessary.

Upon this issue the Schwarzers cite principally Gibralter, etc., v. Harper, Tex.Civ. App., 41 S.W.2d 130 (error refused), also by this court. In that case the Harpers borrowed money (additionally to existing valid liens) on their homestead on 12th Street in Austin, where they were then living and had been living for many years. They designated another residence in another part of the city, in which they were not then living and had never lived (in fact which they did not then own), as their homestead. The agent of the loan company went to the Harper residence on 12th Street, where he took Mrs. Harper's acknowledgment to the trust deed, and found her in actual physical possession of the property, using it for residence purposes. It was held that there was no estoppel under the well-established principle thus stated in Texas Land & Loan Co. v. Blalock, 76 Tex. 85:

"The fact of actual possession and use as the home of the family was one against which the lender could not shut its eyes; and this fact coupled with the interest held by the borrower in the land, made the property homestead in fact and in law, on which the Constitution declares no lien such as claimed in this case can exist.

"Every person dealing with land must take notice of an actual, open, and exclusive possession; and when this, concurring with interest in the possessor, makes it homestead, the lender stands charged with notice of that fact, it matters not what declarations to the contrary the borrower may make."

■ The pertinent facts here present no real analogy to those in the Harper case. Here the apartment house was evidently designed as resident property for two separate families. When the Schwarzers moved from the west apartment they moved into a residence house which they themselves had constructed as a home for themselves, entirely separated from the apartment house. Whatever secret intention they may have had of (some day when they might have the money) joining the two houses together into a single residence, they communicated that intention to no one and took no steps to translate that intention into action in the intervening four years prior to the loan (1930–1934). The apartment house was used principally and almost exclusively for revenue purposes for which it was peculiarly appropriate and for which it was no doubt originally designed. The occupancy of a room by the oldest boy was of a precarious and vagrant nature and not inconsistent with abandonment of the homestead character. That

the old furniture was left in the west apartment was of no significance, as new furniture was purchased for the residence on Lot 1, and the apartment was rented as a furnished apartment. Nor were the uses of other portions of Lot 2 inconsistent with abandonment of that lot as homestead, as they were minor and incidental. See Blum v. Rogers, 78 Tex. 530, 15 S.W. 115. The principal use of the lot attached to the apartment house, which was for rental and revenue purposes.

Mueller was familiar with the property, and inspected it, from the outside, about 60 days before the loan was made. He did not go inside the buildings because he did not want to disturb the occupants; but could see that the house on Lot 2 was what it was conceded to be—an apartment house —as it had two entrances. If he had inspected the inside he would have found nothing to change the physical aspects revealed by the exterior examination. Conceding that he was told by Schwarzer that the boy had a room in one of the apartments, this in itself would not constitute notice of a homestead claim, especially in the face of a solemn declaration to the contrary made by both of the Schwarzers for the purpose of obtaining the loan.

The trial court's judgment is affirmed.

Affirmed.