FONTAINE v. DAVIS & POWELL.

(Court of Civil Appeals of Texas. Texarkana. Feb. 26, 1914.)

1. COMPROMISE AND SETTLEMENT (§ 23*) — EVIDENCE—SUFFICIENCY.

Evidence *held* sufficient to sustain a finding that defendant agreed that a payment made by plaintiffs should satisfy his claim against them for breach of warranty.

[Ed. Note.—For other cases; see Compromise and Settlement, Cent. Dig. §§ 91–94; Dec. Dig. § 23.*]

2. COMPROMISE AND SETTLEMENT (§ 6*) — DOUBTFUL CLAIM.

To render valid the compromise of a claim, the matter need not be really in doubt; but it is sufficient if the parties consider it so far doubtful as to make it the subject of a compromise.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 35–50; Dec. Dig. § 6.*]

Error to District Court, Bowie County; H. F. O'Neal, Judge.

Action by C. Fontaine against Davis & Powell for breach of warranty. From a judgment for defendants, plaintiff brings error. Affirmed.

Smelser & Vaughan and Turner & De Loach, all of Texarkana, for plaintiff in error. Rodgers & Dorough, of Texarkana, for defendants in error.

WILLSON, C. J. Frances Berry, wife of J. H. Berry, owned in her own separate right several tracts of land situated in Marion county, and claimed to also so own a tract of 640 acres situated partly in Marion and partly in Cass county, known as the W. H.

Crain 640-acre survey. Mrs. Berry died, leaving her husband and several children surviving her. By her will she devised the land referred to to her children. February 2, 1906, her surviving husband, without any authority to do so, in consideration of $2,000 paid by appellees, Davis & Powell, who hereinafter will be referred to as "defendants," and of their undertaking thereafterwards to pay him the further sum of $2,500, by an instrument in writing of that date, undertook to sell and convey to defendants all the timber then growing on said land, except oak and hickory, "that is, six inches in diameter at the stump, or over." By the terms of the instrument, defendants were to cut and remove the timber from the land within five years from its date, and within three months thereafterwards were to remove from the land such machinery, houses, etc., as they had placed thereon. The instrument contained a stipulation binding Berry to warrant and defend "the title to said timber unto Davis & Powell, their heirs and assigns, against the claim or claims of any and all persons claiming the same or any part thereof," and also a stipulation that "at the expiration of said five years all standing timber shall revert to and become the property of the grantors." It also contained the following with reference to the Crain survey mentioned above: "The last-named tract, to wit, W. H. Crain, the title to which is now in T. L. Torrans, and it is agreed that Davis & Powell shall pay to Torrans the sum to redeem out of the cash above stated, and to have the title conveyed to them by Torrans, and it is further agreed that the title to land shall be held by Davis & Powell until they have received or become satisfied that they have the timber purchased from all the land as above described, and at which time Davis & Powell agree to convey whatever title received from Torrans to the estate of Frances Berry, deceased."

By an instrument bearing the same date as the one above described, T. L. Torrans, in consideration of $1,885.20 paid to him by defendants, conveyed to them the Crain 640-acre survey mentioned above.

By an instrument dated May 6, 1907, defendants, in consideration of $2,500 paid to them by appellant, Fontaine, who hereinafter will be referred to as "plaintiff," and the latter's two notes for $2,500 each—one payable May 1, 1908, and the other May 1, 1909—conveyed to plaintiff the timber on said tracts of land, warranting the title thereto "against the lawful claim of any and all persons whomsoever." Among stipulations in the instrument not necessary to mention was one as follows: "It is further agreed and understood that the time given for cutting and removing the timber from said lands is provided for and set out in a contract held by said Davis & Powell, which is turned over to me as a part of the consideration of this deed."

By an instrument dated May 6, 1908, defendants conveyed to plaintiff the title they had acquired from Torrans, as stated above, to said Crain 640-acre survey. As explanatory of the conveyance, the instrument contained the following: "It being the intention of this conveyance to place the said J. C. Fontaine in our place and stead with reference to all agreements and contracts that we have and had with the said J. H. Berry in connection with the sale and removal of timber from the land as hereinbefore described, hereby granting and giving unto the said J. C. Fontaine all our right, title, interest, and claim in and to said timber on the 640 acres of land above described, and known as the Old Pruitt (Crain) place, and subrogating him to all our rights and privileges heretofore acquired by us in the purchase of said lands and timber. It being understood, however, that the said J. C. Fontaine is to accept and carry out all agreements and contracts made by us, the said Davis & Powell, with the said J. H. Berry in the purchase, control, and disposition of the lands and timber as hereinbefore set out."

By an instrument dated July 12, 1909, said Berry, then, as he was when he made the conveyance of February 2, 1906, to defendants, without authority to convey said lands, or any interest in same, or in the timber thereon, undertook, in consideration of $800 paid to him by plaintiff, to sell and convey to said plaintiff the oak timber six inches and over in diameter at the stump then standing on said tracts of land, and at the same time to grant to plaintiff 3 years and 3 months in addition to the five years specified in his conveyance to defendants in which to cut and remove the timber and any other property, such as houses, he might place on the land.

October 1, 1910, plaintiff and Mills & Co. entered into a contract whereby the latter undertook to purchase and erect on the land a mill for the purpose of cutting said timber, and thereafterwards to cut and manufacture same into railroad ties, etc.

By an instrument dated October 15, 1910, plaintiff, in consideration of $10,000 paid to him by the Texarkana Tie Company, sold and conveyed to it the timber on said tracts of land, conveyed to him as hereinbefore stated. The instrument contains a stipulation binding plaintiff "to warrant and forever defend all and singular the title to said timber unto the said Texarkana Tie Company, its assigns and legal representatives, against the lawful claim or claims of any person or persons whatsoever." On the same day plaintiff assigned and transferred his said contract with said Mills & Co. to said tie company.

Prior to the date of the transactions between Mills & Co. and plaintiff and the latter and the Texarkana Tie Company, noted above, to wit, on August 2, 1909, the children and devisees of Frances Berry, deceased, who

during all the time of said transactions and the others hereinbefore mentioned owned the timber on all the tracts referred to, except the Crain 640-acre survey, commenced suit against J. H. Berry, plaintiff, defendants, and the National Creosoting Company, whereby said devisees sought as against the parties just mentioned a recovery of damages for timber cut and removed from the land, and to quiet their title to same. So far as the record before us shows to the contrary, nothing was done in the suit so commenced until February, 1911. On the 8th day of that month the plaintiffs therein, the devisees aforesaid, filed an amended petition in which they prayed that the defendants therein be enjoined from cutting the timber on the land. A writ of injunction was then issued as prayed for, and on February 11, 1911, the writ was served on the defendants.

Afterwards the suit so commenced and prosecuted was compromised and settled. The terms of the compromise were shown by an instrument dated April 18, 1911, whereby the plaintiffs in that suit, the devisees aforesaid, in consideration of the conveyance to them by plaintiff of the Crain 640-acre survey, subject to a right reserved by him, during a period of 3 years and 3 months thereafterwards, to cut and remove from it all standing and growing timber thereon "as much as six inches in diameter at the ground," and the payment to them by plaintiff and defendants of the sum of $2,594.40, sold and conveyed to plaintiff "all of the standing and growing timber measuring as much as six inches in diameter at the ground, save and except hickory," upon all the tracts of land hereinbefore referred to, except said Crain tract, and granted to plaintiff, his heirs and assigns, "an easement in and right to go upon said land to cut and remove the timber so conveyed to him upon the same during a period of 3 years and 3 months, beginning on the date of the execution of this deed." By said instrument said devisees, for the said consideration, released all claim they had for damages against plaintiff, "or any other person or persons or corporation holding under him," and all claim they had against defendants and the National Lumber & Creosoting Company, because of timber cut and removed from the land, and agreed to dismiss their said suit. It was stipulated in the instrument "that all rights granted to the said J. C. Fontaine under this conveyance shall terminate and become void at the expiration of 3 years and 3 months from this date, and that all timber herein conveyed to said J. C. Fontaine and all rights herein given shall revert to and become the property of these grantors at the expiration of 3 years and 3 months from the date of this instrument."

Of the $2,594.40 mentioned in the instrument as having been paid by plaintiff and defendants, it appeared that a portion thereof, to wit, $500, was in fact paid by Judge A.

S. Watlington, then president of the Texarkana Tie Company, that $1,250 thereof was paid by plaintiff, and that the remainder thereof was paid by defendants. It further appeared that on November 8, 1911, Watlington assigned the claim he had, if any, against defendants, on account of the payment by him of said $500, to plaintiff.

The suit resulting in the judgment from which this appeal is prosecuted was commenced by plaintiff April 17, 1912. In his petition he alleged the facts to be as they have hereinbefore been set out, and prayed a recovery against defendants, on their warranty to him of the title to the timber they sold him of the $1,250 paid by him and the $500 paid by Watlington to effect the compromise referred to above. He also sought as against defendants a recovery of other sums paid by him and his assignors on account of attorney's fees, taxes, and damages to Mills & Co., which need not be further mentioned here, as he concedes in his brief that he was not entitled to recover therefor as he sought to.

In their answer to the petition defendants alleged, among other things: (1) That the consideration for the conveyance by them of the Crain survey to plaintiff was an agreement on his part to release them of any liability on account of their warranty to him of the title to the timber they had previously conveyed to him; (2) that, after the suit of Mrs. Berry's devisees attacking the conveyance of the timber made to them by J. H. Berry was commenced, they offered to buy the timber from said devisees, and make good their warranty to plaintiff, who refused to permit them to do so, claiming the right in himself to negotiate with said devisees such a compromise of the suit as would give him more time than he was entitled to under his contract with them (defendants) to cut and remove said timber; and (3) as follows, quoting from said answer: "Further specially answering herein, defendants say that, at the time of the settlement of said suit and extension of time secured from said Berry heirs, the defendants denied any liability by reason of any warranty claimed by plaintiff, and that they were released by the contract with plaintiff, dated May ———, 1908; but, for the purpose of a settlement of all matters between plaintiff and defendants and between them and said Berry heirs by reason of said contract with reference to said timber and of the claims and suit of said Berry heirs, defendants agreed to and did contribute the sum of $850 of the amount paid to said Berry heirs in settlement of said suit, and for the extension of time to cut said timber, executed April 18, 1911, and said amount was paid by defendants with the express stipulation and agreement between them and the plaintiff that such sum was in full satisfaction and release of any and all claims of plaintiff against them by reason of and under any warranty of title

to said timber claimed against them by plaintiff, and the plaintiff accepted same, and said amount was paid by defendants in full and complete accord and satisfaction of any and all claims of plaintiff against defendants of every kind and character by reason of all and any contracts or warranties between them respecting said timber, and of all sums paid out for damages, expenses, or other claims by plaintiff."

The trial was before the court without a jury. Among other findings of fact made by the court were the following:

"(6) On August 2, 1909, the heirs of said Frances Berry filed suit in the district court of Marion county, Tex., against said J. C. Fontaine, Davis & Powell, J. H. Berry et al., claiming said lands and timber, as the heirs of their mother, and that under the terms of the will their father had no right to sell the same, or their interest therein; and all the parties defendant were duly served in said suit. That plaintiffs therein afterward filed an amended petition, praying for an injunction, and such injunction against the defendants was granted on February 6, 1911, served February 11, 1911, which stopped the cutting and removing of the timber under said contracts.

"(7) I find that after the service of such injunction, and the refusal of the district judge to dissolve the same, on motion made therefor by the defendants, that the plaintiff, J. C. Fontaine, and the defendants, Davis & Powell, through their attorneys, opened negotiations with the plaintiff for a settlement of said suit, and during such negotiations, after obtaining terms upon which same could be settled for $2,600, the defendants, Davis & Powell, advised Fontaine that they would pay $850 of said $2,600 in full satisfaction and discharge of all claims of Fontaine and the Berry heirs against them, including the warranty herein sued on, or that they would pay the entire amount of $2,600, and give Fontaine the full time mentioned in their contracts with him, with an additional period to equal the period during which his operations had been stopped by reason of the injunction, and thereafter become the owners of the timber remaining on said land for the period granted by said Berry heirs, in settlement of said suit.

"(8) That the said Fontaine refused to permit said Davis & Powell to pay the full amount of said settlement to the Berry heirs, and have said timber for the additional time after the expiration of his contract with them, and thereupon Davis & Powell agreed to and did pay $850 of said $2,600 paid to said Berry heirs, in satisfaction of all their claims, and for three years' extension of time to cut and remove timber on said lands, and Fontaine and the tie company, claiming under him, paid the balance of said money to said Berry heirs, and Fontaine thereby acquired the extended time to remove such timber given in said settlement. That said

Davis & Powell agreed to contribute such sum upon the express condition that they would be released and discharged from any claim of Fontaine by reason of their contracts with reference to such timber, and said Fontaine, in consideration of such payment, released and discharged said Davis & Powell from all claims by reason of the suit of the Berry heirs, and the interference with his cutting of the timber, and of all matters between them arising therefrom, as well as the warranty of Davis & Powell to said Fontaine."

The court concluded, as a matter of law, that plaintiff was not entitled to recover on account of the matters set up in his petition, and rendered judgment that he take nothing by his suit.

The record is before this court for review on a writ of error sued out by plaintiff.

### Opinion.

[1] The contention, and the only contention, made by plaintiff on this appeal is that the finding of the trial court that the payment made by defendants, on account of the compromise effected, operated to release them from liability to him on their warranty of the title to the timber is not supported by the testimony.

It is reasonably clear to us that the contention should not be sustained. At the time, to wit, April 18, 1911, the compromise was effected, the court was warranted in finding from the testimony that the situation of the parties was about as follows: Plaintiff, because of the issuance and service on him of the writ of injunction, had been unable since February 8, 1911, to cut or remove any of the timber defendants had sold to him, and by the terms of his contract with defendants his right to do so would cease on May 1st following. He was asserting a liability on the part of defendants to him because of their warranty of the title to said timber. Defendants were denying any such liability on their part, on the ground that plaintiff had released them therefrom in consideration of their conveyance to him on May 6, 1908, of the Crain 640-acre survey, and were claiming, if they were liable on their warranty, their liability was only for the value of timber plaintiff was prevented from cutting or removing by the injunction aforesaid, and the value of such of same as it might appear he would cut or remove before May 1st. The timber within the terms of defendants' contract with plaintiff then on the land was worth $8,000. Defendants were willing and able to buy same of said devisees, and offered to do so, and then make good their warranty, as they construed it, by giving to plaintiff the right to cut and remove as much as he could of the timber for a period of time equaling that intervening between the date (February 8, 1911) of the issuance of the writ of injunction and the date (May 1, 1911) of the expiration

of the time specified in their contract with plaintiff. The latter was not willing that defendants should so buy the timber, and make good their warranty, because, as he thought, he would not be able,. in the time he would thereby acquire for the purpose, to cut and remove the timber; and he claimed the right to himself negotiate such a compromise of the suit as would give him sufficient time in which to cut and remove same.

[2] Such being the attitude, as the trial court might have found, of the parties at the time the compromise was effected, it is clear, we think, if plaintiff agreed that the payment made by defendants towards the compromise should operate as a satisfaction of all claim he had against them because of their warranty, the court might have concluded that plaintiff's agreement was not without a sufficient consideration to support it, for there was testimony warranting a further finding by the court that defendants' contention not only was made in good faith, but might not be without the support of law. Whether it should be said that it appeared that the contention was without such support or not need not be determined, for it is well settled that, "in order to render valid the compromise of a claim, it is not essential that the matter should be really in doubt. It is sufficient if the parties consider it so far doubtful as to make it the subject of a compromise." 6 A. & E. Enc. Law, p. 713; 1 A. & E. Enc. Law, p. 419; Page on Contracts, § 321; Insurance Co. v. Villeneuve, 25 Tex. Civ. App. 356, 60 S. W. 1016; Gilliam v. Alford, 69 Tex. 267, 6 S. W. 757; City of Longview v. Capps, 123 S. W. 162.

To dispose of the contention made, it is necessary, therefore, only to determine whether there was testimony sufficient to support the finding that plaintiff did agree that the payment made by defendants should be a satisfaction of his claim against them on account of the warranty.

It appeared that the witness Mahaffey was one of the attorneys who represented plaintiff and defendant in the defense of the suit brought against them by the devisees of Mrs. Berry, and that as their attorney he represented them in the negotiations with said devisees resulting in the compromise effected. The negotiations, it seems, began several weeks before the terms of the compromise were finally agreed upon. It seems they were concluded as the result of a conference over the telephone between the witness Mahaffey, then at Jefferson, and the attorney of Mrs. Berry's devisees, then at Marshall. At the time the negotiations were concluded, defendants were with the witness at Jefferson. Plaintiff was in Texarkana, where he resided. After the witness Mahaffey ascertained the terms upon which a settlement could be effected with said devisees, and after he had ascertained from defendants what their position with reference to a settlement on those terms would be, he called over the telephone for plaintiff at Texarkana. Plaintiff, accompanied by Judge Watlington, answered the call. The latter, in the presence of the former, did a part, if not all, of the talking with witness over the telephone. With reference to the negotiations and the terms finally offered by said devisees for a settlement of the matters involved in the suit, and the defendants' attitude towards same, the witness, on his direct examination, testified as follows: "Some weeks, possibly two or three weeks, before the court was to meet at Jefferson I went to Marshall and held a conference with Mr. Jones and Hindman, who had married one of the Berry girls. * * * I finally on that occasion obtained a proposition from them to this effect, that what is known as the Crain tract of 640 acres should be reconveyed to the Berry heirs, and that then they would accept $2,500 for the timber up to the expiration of the contract of Mr. Fontaine and Messrs. Davis & Powell, and for what timber had been cut. I don't know whether their proposition involved an extension of time or not; possibly it did; anyhow not so much time as was ultimately obtained. I reported that settlement by phone back to Texarkana, and talked it over, and we didn't settle at that time. We didn't make any further negotiations to settle until at court at Jefferson; but anyway the matter rested that way. Q. Do you remember the terms of the settlement as it finally went through? A. Yes, sir. Q. Can you state the terms that finally went through? A. Yes; the terms of the settlement are expressed in this deed from the Berry heirs to Fontaine. * * * Q. Who was present at Jefferson when the terms were finally agreed on? A. Mr. Davis and Mr. Powell were present. It was at Armistead's office, and I took up the negotiations with Sol Jones at Marshall over the phone, and with Mr. Fontaine at Texarkana—either Mr. Fontaine or Judge Watlington; I don't know. They seemed to be together, and I would talk over the phone, and perhaps talked once or twice, or three times; I can't remember about that; and I had two or three conversations with Mr. Jones over the phone at Marshall. Mr. Davis and Mr. Powell were there in the office of Tom Armistead—that's where the negotiations took place at the time the settlement was finally agreed upon. * * * Q. I will get you to state whether or not you made any contract with Davis & Powell in the event they paid $850 it would be in full settlement of all their liability on their warranty. A. I can state what transpired there as near as I can recollect it, at Jefferson. Mr. Davis and Mr. Powell contended first that they had been relieved from their warranty by an instrument that had been gotten up on May 6, 1908, some time about that time. Mr. Powell and Mr. Fontaine both would at times try to broach this question of liability on the warranty. I told them I was representing both of them, and I didn't propose to advise

either about those questions. I didn't think it was the proper thing to do, and I refused to do it; but, when the settlement came up, they contended, first, they had been released, and then they contended that they could go and buy the timber from the Berry heirs, and make the warranty good. They contended the warranty only extended about two months longer; but it finally got down to the proposition where they got up to the point that they would pay $800, and that's all they would pay, otherwise they would go and buy the timber from the Berry heirs, and make their warranty good. I telephoned that to Texarkana (for me to say whether I was talking directly to Judge Watlington or to Mr. Fontaine, I couldn't say positively about it); but I put the proposition up to them that this was what Davis & Powell would pay, 'and that it was the last cent they say they will pay.' * * * Mr. Fontaine, or whoever it was doing the talking, said Judge Watlington would pay $500, and Mr. Fontaine $1,250; and then another hitch arose. Sol Jones said in getting ready for trial he had gone out and incurred the expense of getting a timber expert to count how many ties had been cut, and had incurred, I believe, $117 expense for that; but finally, it seems to me, I got him to reduce that amount to some extent, and finally Mr. Davis or Mr. Powell said they would pay that." On his cross-examination the witness testified: "Q. Didn't Mr. Davis and Mr. Powell contend in fixing the amount that they would contribute to the settlement of the Berry heirs, say that was all they would do, because they could settle with the Berry heirs, and make good their warranty, and that would be the end of it so far as Mr. Fontaine was concerned, and Mr. Fontaine asked you, and you told him, 'Yes'? A. Now, I will say I know that they said that, and I know it was my belief that they could do that, if they made the warranty good for the time. I know I would have given it as my opinion that way, and my best recollection is that I told Mr. Fontaine that; but I can't be positive on account of the lapse of time. Q. You know that the matter was discussed in your presence? A. I know that Mr. Powell and Mr. Davis discussed it in my presence; my best recollection is that Mr. Fontaine was present. Q. They said that in his presence? A. I know they made that to me, and I telephoned to Texarkana. Court: That they should be released? A. They said: 'We will contribute this much to settle this matter, to make the settlement contemplated, and that's all we will do. If Mr. Fontaine won't put up the balance, we will buy from the Berry heirs, and make our warranty good, including the time that he has been stopped, and that will fill the measure of our warranty, and that's all we will do.' Court: Did Mr. Fontaine agree to that? A. I stated that to Texarkana; whether the conversation was had directly with Mr. Fontaine in person, I don't know about that, because I regarded him and Judge Watlington as one; their interests were joint in it; the authority came back to me in that telephone message to make the settlement on those terms. Q. I believe you stated they were together, and they seemed to be in the same room together? A. Yes; I thought they were. I would talk with one, and then with the other; which one I talked with it is impossible for me to say; I didn't attach so [much] importance to that because I considered them one. Q. You explained to them fully how the settlement could be made, and they gave you authority to make the settlement, contributing these amounts that you spoke of? A. Yes, sir."

Judge Watlington testified: "I heard the testimony of Mr. Mahaffey with reference to telephoning me and Mr. Fontaine as to the terms of the final settlement with the Berry heirs. I think Mr. Fontaine was present at the time that I talked with Mr. Mahaffey over the phone. I tried to report at that time correctly to Mr. Fontaine what Mr. Mahaffey said about the settlement; we all discussed it, and what we would do—the terms of the settlement. I recall that Mr. Mahaffey stated to me the terms of the settlement, and what Davis & Powell said about what they would do. Yes; Mr. Mahaffey said what they would do, what they said they would do, and they were there talking as I understood it. * * * Mr. Mahaffey said that Davis & Powell would pay $800. We felt Mr. Fontaine would pay the balance, and he said he couldn't or wouldn't pay the balance. * * * I told Mr. Mahaffey that I would pay $500 in order to get the matter closed up. Mr. Fontaine had refused to pay more than $1,250; that's what induced me to pay $500. * * * The best I recollect of it Mr. Fontaine sent for me, or came to me, to talk with Mr. Mahaffey at Jefferson, and when we got Mr. Mahaffey he says, 'I have got it down to this proposition, and Davis & Powell would pay $800'; I think that was the amount; and he said, 'That's the very best they will do.' I said, 'Wouldn't they pay half? Mr. Fontaine thinks they ought to pay half.' He said, 'No; that's their ultimatum; that's the very best they will do, and there is no use for any further talk.' I had induced several parties to go into the tie company, and I felt in honor bound to get out of it as quick as possible; to get the business running, I said over the phone to Mahaffey, 'I will pay $500 myself;' and he said, 'Well, I think I can close it on that basis.'"

It appearing from the testimony we have quoted at such length that Mr. Mahaffey fully advised Judge Watlington in the conversation between them over the telephone of the condition upon which the defendants were willing to pay the sum they did pay on the compromise, that Judge Watlington tried to correctly report to plaintiff, then present, what Mr. Mahaffey said, and that the latter thereafterwards was instructed to make the compromise on the terms he had advised same

could be made, we do not think it can be said that the finding of the trial court that plaintiff agreed that the payment to be made by defendants should operate as a satisfaction of his claim against them because of the warranty was without evidence to support it. It is evident from the inquiry Judge Watlington said he made to ascertain if defendants would not pay more than they had offered to pay, and from his statement to Mahaffey that plaintiff thought they ought to pay one-half of the sum demanded by Mrs. Berry's devisees, that both Judge Watlington and plaintiff knew defendants were denying any liability on their part for as great a sum as said devisees were demanding, and that the point of difference between them and plaintiff, so far as the settlement was concerned, was the amount each should pay towards bringing it about. In that state of the testimony, we think the court was fully warranted in concluding that plaintiff, as well as defendants, understood that the sum to be paid by the latter was to operate as satisfaction in full of all claim he had against them.

Having reached the conclusion that the finding of the court in question was supported by testimony, and so disposed of the only assignment in the brief, we need not inquire whether, had we reached a contrary conclusion, the judgment should be affirmed on other grounds or not.

The judgment is affirmed.