O'FIEL et al, v. JANES et ux.    (No. 1035.)*

(Court of Civil Appeals of 'Texas. Beaumont. Jan. 30, 1925.    Rehearing Denied Feb. 18, 1925.)

1. **Homestead** ⬡═167—**Facts held to show abandonment of property as homestead as matter of law.**

Where portion of homestead was sold to another, who divided it into lots and blocks, placed plat on record, and sold some of lots, but later reconveyed them to homestead owners, who accepted and ratified change in land, and fulfilled contracts for sale of lots, paid taxes thereon as city property, and husband sold a number of such lots without wife joining him, *held*, that such acts constituted abandonment of such land as a homestead as a matter of law.

2. **Dedication** ⬡═19(1)—**Owner, creating addition to city and laying out alleys and streets thereon, irrevocably dedicates them to public use.**

An owner of real estate, who establishes an addition to a city, divides it into lots and blocks, intersected by streets and alleys, and places plat on record, thereby irrevocably dedicates such streets to public use.

3. **Dedication** ⬡═19(4)—**Homestead owners, irrevocably dedicating portion thereof as streets for public use, cannot thereafter claim it as a homestead, or deny public use thereof.**

Where portion of homestead was sold to another, who made a city addition thereof, divided it into lots and blocks, intersected with streets and alleys, and thereafter reconveyed it to homestead owners, who accepted and ratified the change of status of land, *held*, that homestead owners thereby irrevocably dedicated streets in city addition to use of public, and could not thereafter deny the right of the public to use such streets.

4. **Compromise and settlement** ⬡═6(5)—**Execution of deeds by parties to suit to each other for purpose of settling controversy held a voluntary settlement for valuable consideration, and binding.**

Where portion of plaintiffs' land was sold to defendant under execution, and by mutual agreement, for purpose of settling controversy between them, land was divided, and each delivered a deed for one-half thereof to the other, it constituted a voluntary·settlement of

matters in issue, and was binding on the parties.

**5. Homestead ⊚⇒124—Not necessary for wife to join in settlement deed executed by husband, where land had been abandoned as part of homestead.**

Where undisputed evidence showed that portion of husband's and wife's land sold to defendant under execution had been abandoned by them as part of their homestead, and that, for purpose of settling a controversy between plaintiffs and defendant, each deeded to the other one-half of such land, it was not necessary for wife to join in such settlement deed.

**6. Compromise and settlement ⊚⇒6(2)—Character or value of respective claims not considered in passing on effect of compromise settlement.**

No investigation into character or value of respective claims will be made in passing on effect of compromise settlements; it being sufficient that parties thought there was a question between them.

**7. Compromise and settlement ⊚⇒6(2)—Not set aside, where right doubtful or controverted, if made in good faith, without fraud.**

When a right is doubtful or controverted, or where the object is to avoid or settle litigation, a compromise duly executed will not be set aside, if parties acted in good faith, without fraud or misrepresentation.

**8. Compromise and settlement ⊚⇒6(I)—Mutual agreement for compromise in itself a valuable consideration.**

A mutual agreement for compromise is in itself a valuable consideration.

**9. Homestead ⊚⇒181(2)—Declarations of husband and wife, accompanying their acts, held admissible to show intent to abandon land as homestead.**

Where acts by husband and wife in selling portion of their homestead, which was made a city addition and subsequently reconveyed to them, part of which they sold as lots, were admitted in evidence, and alleged to have constituted an abandonment of such land as a homestead, declarations made by them accompanying such acts were admissible to show their intent to abandon such land as part of their homestead.

**10. Evidence ⊚⇒269(I)—Where intent subject of inquiry, and acts admitted in evidence, declarations accompanying acts admissible.**

Where intention is subject of inquiry, and acts are admitted in evidence, declarations accompanying such acts and explanatory of them are admissible.

**11. Compromise and settlement ⊚⇒6(5)—Valuable consideration sufficient to support settlement deed.**

Where a compromise settlement was entered into between parties contesting claim as to ownership of property, whereby each gave other deed to one-half of disputed property, a valuable consideration was all that was necessary to support conveyance, and an instruc-tion submitting to jury whether a fair and adequate consideration was paid for such settlement deed was erroneous.

**12. Trial ⊚⇒350(3), 352(I)—Evidence held not to raise issue of good faith of one suing to recover land, warranting submission of such issue; but, if it did, charge was argumentative and prejudicial.**

Evidence *held* not to raise issue of good faith, warranting submission of issue as to whether one filing suit to recover certain land, being a lawyer, in good faith believed that he had right to recover such land; but, if it did, such charge *held* argumentative and prejudicial.

Walker, J., dissenting.

Appeal from District Court, Jefferson County; E. A. McDowell, Judge.

Suit by Zeke Janes and wife against David E. O'Fiel and others, in which E. E. Easterling and another intervened. Judgment for both plaintiffs and interveners, and defendants appeal. Reversed and rendered.

See, also, 220 S. W. 371.

David E. O'Fiel, J. A. Harrison, and Howth, Adams & Hart, all of Beaumont, for appellants.

C. A. Lord, E. E. Easterling, and E. M. Chester, all of Beaumont, for appellees.

O'QUINN, J. This is a suit in trespass to try title, brought by Zeke Janes and his wife, Alzena Janes, against David E. O'Fiel and his vendees, for the land described in plaintiffs' petition. Plaintiffs' original petition was filed February 21, 1917. Pending trial, Zeke Janes died on the 26th day of August, 1922, and E. M. Chester was made executor under his will, and he and Janes' heirs made themselves parties plaintiff to the suit, together with Alzena Janes, wife of Zeke Janes, and on February 6, 1923, filed their third amended original petition in the usual form of trespass to try title, on which the case was tried. E. E. Easterling and H. M. Whitaker, on December 1, 1917, intervened by petition in the form of trespass to try title for an undivided one-half interest in the land sued for. H. M. Whitaker died intestate on December 15, 1922, leaving a wife and four children, who made themselves parties to this suit, and together with E. E. Easterling filed their first amended original petition, on which they went to trial.

Defendants, by their third amended original answer, filed February 5, 1923, answered by general demurrer, special exceptions, plea of not guilty, and general denial. The vendees of O'Fiel answered that they were innocent purchasers in good faith from O'Fiel, without knowledge of plaintiffs' interest in the land, and pleaded improvements in good faith.

The case was tried before the court with a jury, and at the conclusion of the evidence

defendants requested the court to instruct a verdict in their behalf, which was refused, and the cause submitted to the jury upon special issues, the charge of the court in full being:

"Gentlemen of the Jury: You are instructed that the 55 acres of land, of which the land in controversy is a part, was the country homestead of Zeke Janes and wife at the time they made the deed to D. Kinard, conveying the 40-acre tract, of which the land in controversy is also a part. And since this land was reconveyed by D. Kinard to Zeke Janes on September 14, 1914, to settle the vendor's lien notes given for the land, the land came back as a part of the homestead of Zeke Janes and wife; in fact, the land never lost its homestead character by the conveyance to D. Kinard.

"You are also instructed that the contracts of sale made by D. Kinard and transferred to Zeke Janes, and which Zeke Janes agreed to carry out, did not divest the land of its homestead character, except as to lots or parcels, if any, which under said contracts were conveyed to purchasers by Zeke Janes and wife.

"Now, keeping in mind the above instructions, you will answer the following questions:

"First Special Issue.—Was the 40 acres of land levied on and sold to D. E. O'Fiel at the time of levy and sale a part of the country homestead of Zeke Janes and wife? Answer 'Yes' or 'No,' as you may find the facts to be.

"In answering the above question, you are further instructed that the platting of the land in controversy into lots and blocks and designating the same as the Silver City addition to the city of Beaumont, and recording the map and selling and offering for sale the lots therein, would not cause the same to lose its character as a country homestead. In this connection, however, you are instructed that, if you shall find from the evidence that at the time of the sale of said lands to the defendant David E. O'Fiel that the same was so situated and surrounded by other lands which were improved and built up and occupied by people, the same being adjacent to, connected with the said land, and contiguous thereto, so as to form a contiguous whole as a collective body of houses and inhabitants forming one body, as distinguished from separate and distinct masses, and having a community of interest, because residents of same place, not different places, so that the whole created a unity of compactness and contiguity, forming a village or town, a part of the city of Beaumont, then and in that event, if you so find, it would have the effect to destroy the homestead character of the said land in controversy.

"Second Special Issue.—Do you find that David E. O'Fiel paid to Zeke Janes ten dollars ($10) as a part of the consideration for the deed of May 28, 1917? Answer 'Yes' or 'No,' as you may find the facts to be.

"Third Special Issue.—Do you find that, as a part of the consideration for the deed of May 28, 1917, David E. O'Fiel agreed to and did release to Zeke Janes the judgment as rendered against him in the case of V. A. Collins et al. v. Beaumont Land & Investment Company? Answer 'Yes' or 'No,' as you may find the facts to be.

"Fourth Special Issue.—Do you find that at the time David E. O'Fiel filed the suit against Zeke Janes and wife in the Fifty-Eighth district court to recover blocks 8, 9, 10, 11, and the north half of blocks 12 and 13, he, being a lawyer and acquainted with all the facts, in good faith believed on probable cause that he had a right to recover the lands sued for? Answer 'Yes' or 'No,' as you may find the facts to be.

"Fifth Special Issue.—Do you find that David E. O'Fiel paid Zeke Janes and wife a fair and adequate consideration for the land conveyed by the deed which they made to him on May 28, 1917? Answer 'Yes' or 'No,' as you may find the facts to be.

"Sixth Special Issue.—Do you find that the defendants George Hicks, Antwine Moses, Alfred Cormier, Valmore Cormier, and John Moses have had adverse possession in good faith of those parts of the land in controversy claimed by them, respectively, for at least one year next before the commencement of this suit, which was filed on the 21st day of February, 1917? Answer 'Yes' or 'No,' as you may find the facts to be.

"Seventh Special Issue.—Do you find that the defendants George Hicks, Antwine Moses, Alfred Cormier, Valmore Cormier, and John Moses have made permanent and valuable improvements on the several tracts of land claimed by them, respectively, before the filing of this suit? Answer 'Yes' or 'No,' as you may find the facts to be.

"Eighth Special Issue.—If you answer the last above question 'Yes,' then now state the present value of such improvements made by each defendant referred to.

"Ninth Special Issue.—What is the present value, respectively, of each tract of land claimed by the defendants George Hicks, Antwine Moses, Alfred Cormier, Valmore Cormier, and John Moses?

"The burden of proof is upon the plaintiff and interveners to establish by a preponderance of the evidence every fact essential to establish their right to recover herein. And the burden of proof is upon the defendant to show by a preponderance of the evidence such affirmative matters by way of defense that he has set up in his defense herein, which are necessary to establish his cause. You are the exclusive judges of the facts proved, the weight to be given to the testimony, and the credibility of the witnesses, but you will take the law from the court which is herein given to you and be governed thereby.

"[Signed] E. A. McDowell, Judge Presiding."

In answer to the above special issues, the jury returned the following verdict:

"We, the jury, answer the questions submitted to us as follows:

"Special issue No. 1 we answer: 'Yes.'
"Special issue No. 2 we answer: 'Yes.'
"Special issue No. 3 we answer: 'Yes.'
"Special issue No. 4 we answer: 'No.'
"Special issue No. 5 we answer: 'No.'
"Special issue No. 6 we answer: 'Yes.'
"Special issue No. 7 we answer: 'Yes.'
"Special issue No. 8 we answer: 'John Moses, land, $150.00; improvements, $750.00; A. Moses, land, $150.00; improvements, $800.00;

V. Cormier, land, $900.00; improvements, $1,000.00; A. Cormier, land,. $300.00; improvements, $1,250.00; G. Hicks, land, $65.00; improvements, $750.00.' "

Upon the answers of the jury to the special issues, judgment was rendered for plaintiffs and interveners for the land in controversy; the judgment further fixing and adjudging that the defendants, vendees of O'Fiel, had made permanent and valuable improvements in good faith upon portions of the land, and protecting them in the usual manner with respect to the value of said improvements. Motion for new trial being overruled, defendants bring this appeal.

Prior to the 25th day of February, 1914, Zeke Janes and his wife owned and lived upon 55 acres of land, a part of the J. W. Bullock survey, in Jefferson county, Tex. This land, during all the time they had lived on it prior to said date, was used by them for homestead purposes. On this date, February 25, 1914, they conveyed by warranty deed to D. Kinard 40 acres of the 55 acres for a consideration of $8,000, $200 of which was paid in cash, and the balance by vendor's lien notes on the property. At the time this deed was made, the 40 acres was under fence, and for years Janes and his wife had cultivated same. , Immediately after the execution of their deed to Kinard, Janes and wife delivered possession of the 40 acres to Kinard. Kinard, with the knowledge and consent of Janes and his wife, bought the land for the purpose of cutting it up into lots and blocks and making it an addition to the city of Beaumont. Immediately upon taking possession of the land, Kinard subdivided it, following out his understanding with Janes and wife, into lots and blocks, and opened up streets and alleys over and across the land, graded the streets, and numbered the lots and blocks, and marked them by painted stakes with numbers thereon placed on the lots. Kinard named this addition the "Silver City Addition to the City of Beaumont, Texas." Janes named the streets therein either for members of his family or near relatives. Kinard had a map made of the addition, and filed the same for record in the office of the county clerk of Jefferson county, Tex., on March 18, 1914, and same was duly recorded in volume 3, p. 66, of the Map Records of said city. The following is a copy of said map or plat:

It will be noted from this map that Janes' original 55 acres consisted of two tracts, one of 15 acres, upon which he resided, and the other of 40 acres, connected by a narrow strip, which was shown to be 100 feet wide and 432 feet long. The portion sold comprised the 40-acre tract and the narrow strip. The map of the Silver City addition to the city of Beaumont does not delineate the surrounding property—only partially. The official map of the city of Beaumont, which was introduced in evidence, shows the Pennock & Potts addition extends to the north of a portion of the Janes 15-acre tract, with Hegele street lying between them. This street is shown in the Silver City addition map.

The record discloses that, some time before selling the 40 acres to Kinard, Janes platted the 15-acre tract and the narrow strip and a portion of the 40-acre tract into lots and blocks, with streets and alleys, for the purpose of selling lots, and designated it the "Janes Addition," and that in doing so he numbered the narrow strip as blocks 6 and 7. It does not appear that Janes had a map of the proposed addition placed of record, or that he sold any of the lots. This effort at making a city addition seems to have fallen through, and then later he sold the 40 acres to Kinard, with the understanding that Kinard was to subdivide it into lots and blocks, grade the streets, number the lots, and plat it, which Kinard did, and, as above stated, called it the "Silver City Addition." In platting the 40 acres, Kinard retained the numbering of the blocks covering the narrow strip connecting the 15-acre tract and the 40-acre tract, as it was numbered in the first attempt by Janes, Nos. 6 and 7, and blocks 8, 9, 10, and 11, the portion of the 40-acre tract platted by Janes, as that appeared in the Janes prior platting. In other words, the platting by Kinard followed the platting by Janes.

The remainder of the 40-acre tract platted by Kinard was not platted by Janes, but Kinard numbered the blocks consecutively down to 17. His numbering also conformed to the numbering of the Pender addition. It will also be noted that, in platting the Silver City addition, Kinard extended Hebert street, which extended between the Pennock & Potts addition and South Park Colored School, and which also lay south of the Pender addition, west across the entire length of the Silver City addition. He also extended Marie street, which enters from the Pender addition on the north, south across the entire length of the Silver City addition dividing it so that blocks 6, 7, 8, 11, 12, 15, and 16 were on the east of Marie street, and blocks 9, 10, 13, 15, and 17 were on the west of said street. Hebert, Nora, Lela, Sarah, Lucile, and Rena streets entered the addition from the west, crossing it and butting up against property on the east, while Burton street (as shown by the City Map) connected it on the east (crossing the S. & E. T. Railway) with Glover street, connecting with various portions of the city. May street, one of the Pender addition streets, entered the narrow strip between blocks 6 and 7. The platting of the Silver City addition was made so as to fit in with the streets and locations of adjacent additions.

Kinard, after platting the land and recording the map, began at once to sell the lots, under an agreement with Janes and his wife that they would release such lots from their vendor's lien when Kinard paid the proportionate part therefor. In September, 1914, not being able to carry out his contract with Janes and wife, Kinard and wife reconveyed the land to them, save and except 9 lots, which had been sold, and on which Janes and his wife had released their vendor's lien. These lots were scattered over different blocks of the addition. At the time that Kinard and wife conveyed the land back to Janes and his wife, and as a part of the consideration for the reconveyance, they agreed with Kinard in writing to carry out all the contracts Kinard had made with parties for the sale of lots in this addition. Kinard testified to, and the record shows, 64 contract holders, calling for from 1 to 3 lots each, aggregating 74 lots Kinard had contracted to sell, over and above the 9 lots actually sold, and on which plaintiffs had released their lien, and these 74 lots were scattered over the entire addition, some in each block. There were 7 in block 7, 6 in block 8, 16 in block 9, 9 in block 10, 6 in block 11, 4 in block 12, 5 in block 13, 10 in block 14, 4 in block 15, 3 in block 16, and 4 in block 17; the lots thus contracted to be sold being scattered promiscuously over the blocks. There was one on Rena street, not enumerated in the above, and the 9 sold and delivered by Kinard, making a total of 84 lots sold and contracted to be sold by Kinard. The parties who held the contracts of sale had paid in cash from $5 to $145 on their purchase contracts, but the most of them only $5, the lots to be paid for in monthly installments. These contracts of sale, embracing 75 lots, on which various sums of money had been paid, Janes and his wife contracted with Kinard in writing to faithfully carry out, according to the terms of the contracts.

Kinard and wife reconveyed the land to Janes and wife on September 8, 1914. On September 19, 1914, Janes sent the following letter to each of the contract holders:

"Beaumont, Texas, Sept. 19, 1914.

"Dear Sir: Some time ago I sent you a postal card, calling your attention to the fact that I had taken over the Silver City addition, and informed you that your contract and note was held by the Guaranty Bank & Trust Company of Beaumont for collection. This information was scarcely sufficient. You have

purchased some valuable property and have made your payments in good faith, and I desire to assure you that you will receive a deed when the property has been paid out under the terms of your contract.

"Your contract was made with the Silver City Land Company, which was no more or less than Mr. D. Kinard and his wife of this city. Mr. Kinard purchased this property from me, but was unable to pay for it in full. He paid a small amount down in cash and gave me his note for the balance. When one of these notes recently came due for $1,000, Mr. Kinard was unable to pay the principal or interest, and I found it necessary to place the matter in the hands of my attorney for collection. The failure to pay this note matured all of them, so that Mr. Kinard owed me $8,300 of principal, interest, and attorney fees. It then became necessary for me to either sue Mr. Kinard or recover the property, to take a deed from him, returning it to me. He gave me a deed back to the property, and I agreed to give deeds to every one of his contract holders, who paid up *according to their contract.* This arrangement is very much in your favor, as it guarantees that you will receive a deed when you have paid up. Under the old plan there was no assurance whatever that you would ever get title to your property, because, so long as it was not paid for, Mr. Kinard might lose it, and you would have to look to him alone for the return of the money paid. Now that you are dealing with me, the absolute owner of the property, you are entirely safe.

"You can make your payments to the Guaranty Bank & Trust Company of Beaumont by check or money order, ·or express order, or deliver there in person. The bank will give you a receipt and will credit same on your note. The bank sends to me each time a duplicate deposit slip, from which I enter your credit up in the record kept by me. In this way there will be three records of every payment you make, and there can be no error to your harm.

· "Don't let any one persuade you that there is a chance for trouble. I refer you to Mr. J. L. Cunningham, the active vice president of the Texas Bank & Trust Company, and to any of the old· citizens of Beaumont as to my standing and responsibility. You have made a good trade, and don't let anybody, for reasons of their own that you may or may not recognize ·and understand, try to persuade you otherwise. Don't let any one unload on· you any worthless property. The lots in Silver City addition are 50x140 feet. The property is only about six blocks from the Interurban Railroad, is high and well drained, and the streets are all graded. This part of the suburbs of· Beaumont is rapidly growing and this is certainly the most desirable property available at this time for colored people. You get all of the advantages of the city without having to pay city taxes.

"Very truly, .
　　　　　"Silver City Investment Co.,
　　　　　　　　"By Zeke Janes, Owner."

On September 20, 1914, Janes, in writing, appointed George W. Richardson his agent to sell lots in the "Silver City addition to the ·city of Beaumont." He also appointed, in. ·writing, J. W. Williams, J. R. Jacobs, ·and

Frank Evans to sell lots in the "Silver City addition to the city of Beaumont." These appointments appear to have been also made in September, 1914. Written contracts with these parties recite that he "is the owner of certain lots and ·blocks, constituting the, major portion of what is known as the Silver City addition to the city of Beaumont," etc.

On October 30, 1914, by virtue of an execution issued on a judgment against Zeke Janes, the sheriff of Jefferson county levied on all of blocks 8 to 17, inclusive, of said Silver City addition, as shown by the above map, except the 9 lots above referred to as having been sold by Kinard, and on the 1st day of December, 1914, said sheriff, at public sale, sold the land so levied upon by him to appellant, David E. O'Fiel, executing to him a deed thereto, and O'Fiel paying therefor the sum of $435. Shortly· after the sale. of the land Janes tried to arrange with O'Fiel for the reconveyance of the land from O'Fiel to him, claiming he had the right to repay the purchase money, with interest, to O'Fiel and get the land back, and after considerable dickering over the matter, for the purpose of settling any controversy that might arise between them, on December 7, 1914, O'Fiel and Janes divided the land, Janes taking blocks, 8, 9, 10, and 11 and the north half of blocks 12 and 13, and O'Fiel taking blocks 14, 15, 16, and 17, and the south half of blocks 12 and 13. Janes executed a quitclaim deed to O'Fiel for the part O'Fiel took, and O'Fiel executed a special warranty deed to Janes to the portion he took.

Something more than two years after this settlement of the matter between Janes and O'Fiel, Janes and his wife became dissatisfied, and on February 21, 1917, filed this suit to recover the land conveyed by Janes to O'Fiel. When this occurred, O'Fiel filed suit against Janes and his wife for the recovery of the land conveyed to him by O'Fiel. May 28, 1919, Janes and wife and O'Fiel, for .the purpose of settling their lawsuits, made a new agreement, whereby Janes and wife executed to O'Fiel a new quitclaim deed to the land in controversy in this suit, being the land Janes had deeded to O'Fiel to settle the matter in the first instance, and O'Fiel executed a deed to Janes and wife for the other half, being the land· deeded by O'Fiel to Janes in the first settlement, and there was entered what purported to be· an agreed judgment embodying this settlement. Before the execution of these deeds and pending this litigation, as a fee to represent them, Janes and wife executed to Whitaker and Easterling a deed to an undivided one-half interest in the· land in controversy here; this deed being their title in their intervention.

At the time the sheriff levied on the premises, a large community of negroes lived north and west of and immediately adjacent to the· Silver City addition to the city of Beau-

mont, Tex. The Pender addition, which adjoined the Silver City addition, was thickly populated; one of the witnesses testifying that there was scarcely a vacant lot in this addition. It was testified that there were some 200 houses in the Pennock & Potts addition. The South Park Colored School was about two blocks from this property, and was attended by some 500 negro children. In the north part of the Pender addition was a negro church. Two or more stores were in this community, and it was testified that there was something like 500 houses in the vicinity, and the locality had the usual indicia of a town or city, except a post office. The streets across Silver City addition were constantly used by the public. The nine lots sold by Kinard were scattered over this addition, and each of them improved and occupied by the purchasers. The Pennock & Potts and Pender additions were adjacent thereto, and other additions adjoined, or were nearby, as is shown by the city map in evidence.

After the land was reconveyed by Kinard to Janes and wife, they never replaced any of their fences, all of which had been removed by Janes when he sold to Kinard, nor made or attempted to make any use of the land in any manner connected with their home, or for homestead purposes, but the lots and blocks remained entirely open, and the streets were continued to be used by the public, and they appointed agents to continue to sell lots as per the map or plat made by Kinard, and by which they sold lots to the public.

We have stated what we deem to be the most of the main facts reflected by the record, and will state such other facts as are necessary in the discussion of the questions decided. Appellants present 22 propositions for consideration, but we shall not discuss all of them, nor in the order of their presentation.

We think the court erred in refusing appellants' requested instruction for an instructed verdict in their favor, on the ground that the undisputed evidence showed that, at the time the levy was made on the land and the sale under execution was made to appellant O'Fiel, Janes and his wife had abandoned the use of the land as a part of their homestead.

[1] When Janes and wife sold the land to Kinard, and it was severed from the remainder of their homestead, it ceased to be a part of their home. Kinard bought the land under an agreement with Janes and wife that it was to be at once divided into lots and blocks, with streets and alleys, and created and converted into an addition to the city of Beaumont. Immediately after Kinard bought the land, Janes removed his fences inclosing same, and Kinard platted and divided the entire tract into lots and blocks,

with streets and alleys intervening, and placed the map or plat on record, graded the streets, and proceeded to sell the lots, and the public began to use the streets. September 8, 1914, finding himself unable to carry out his contract with Janes and wife, he reconveyed the land to them, except the lots he had sold, and upon which they had released their vendor's lien; they agreeing with him, as a part of the consideration for the reconveyance of the land, to recognize and carry out all of the contracts for the sale of the lots Kinard had made with persons, to the number of 64, calling for 75 lots, scattered all over the said addition, some in each block of same. It is thus seen that, when Janes and his wife got the land back from Kinard, it was very materially changed from its status and condition when they sold it. Whether it became a part of their homestead upon being reconveyed to them depended mainly upon the use to which they put it. If it was devoted to homestead purposes, it became a part of their homestead. If not, it did not so become. This is the test by which its character is to be determined. Autry v. Reasor, 102 Tex. 128, 108 S. W. 1162, 113 S. W. 748.

Suppose that Janes had purchased this amount of land from another person—land that had never been any part of his homestead, though adjoining the tract of 15 acres upon which he resided. Would it have become a part of his homestead, unless it was used for homestead purposes? Certainly not. No more could this tract, after having been severed by sale, deed, and delivery, have been restored to its former homestead character when reconveyed to him, unless it was used for homestead purposes after its reacquisition. As before said, when Janes and wife conveyed the land to Kinard by deed describing it by metes and bounds, it was severed from the remainder of his homestead and ceased to be a part of the home; and when it was reconveyed to them, in order for it to have become a part of their homestead, it must have been used for home purposes.

After getting the land back, Janes appointed agents at once to continue the sale of lots in this addition according to the map or plat of same as made by Kinard, and notified the purchasers with whom Kinard had made contracts of sale that he would carry out the undertakings of Kinard, and thus accepted and ratified the changed status and the use of the land and the purpose to which it had been devoted by Kinard, and at no time prior to the levying upon and sale of the land under execution did they ever use or attempt to use the land or any portion of same for homestead purposes, but were simply holding the lots for the sole purpose of sale and speculation. This, as a matter of law, constituted abandonment of the land for homestead purposes, and was a voluntary putting of it to another and different

use in no way connected with, but foreign to and inconsistent with, its use as a homestead. Clark v. Nolan, 38 Tex. 416, 421, 422; Waggener v. Haskell, 13 Tex. Civ. App. 630; 35 S. W. 711; Blum v. Rogers, 78 Tex. 530, 15 S. W. 115; Shook v. Shook, 21 Tex. Civ. App. 177, 50 S. W. 731; Warren v. Kohr, 26 Tex. Civ. App. 331, 64 S. W. 62; Langston v. Maxey, 74 Tex. 155, 12 S. W. 27; Wynne v. Hudson, 66 Tex. 1 (8), 17 S. W. 110; Autry v. Reasor, 102 Tex. 123, 128, 108 S. W. 1162, 113 S. W. 748; Martines v. City of Dallas, 102 Tex. 54, 109 S. W. 287, 113 S. W. 1167; Smith v. Uzzell, 56 Tex. 315; Hudgins v. Thompson, 109 Tex. 433, 435, 211 S. W. 587.

As other evidence disclosing that Janes did not regard the property sold under execution as a part of his homestead prior to the filing of this suit, the record discloses that for the years 1915, 1916, and 1917, which was up to the time of the filing of this suit, he rendered for taxes all that portion of same deeded to him by O'Fiel December 7, 1914, in their compromise of their differences, as city property, described as situated in the "Silver City addition to the city of Beaumont"; his renditions showing the lots and blocks by numbers. Also he (Janes), without his wife joining him, sold lot 7, block 9, to Morris Pellerin, on June 11, 1915; lot 6, block 11, to Timothy Fennels, on March 6, 1917; lots 19 and 20, block 9, to L. K. Shaw, on March 2, 1917; lots 1, 2, 3, and 4, block 11, and lots 2 and 8, block 10, lots 5, 6, 13, 14, and 15, block 10, lot 10, block 11, and lots 3, 7, and 8, block 13, to Jack Janes, on March 6, 1917; lot 5, block 11, to Ophelia Fennels, on March 6, 1917; lot 13, block 9, to Alex Nichols on January 3, 1916; lots 16, 17, 18, and 19, block 10, on March 16, 1917, to Mabel Janes; lot 2, block 8, to Clarence Beaumont, on January 19, 1917; lots 1, 2, and 4, block 12, to Wesley Cormier on February 1, 1918—thus treating the property as distinct and separate from the homestead.

[2] Furthermore, when the owner of real estate lays out and establishes an addition to a city and makes a plat of and divides it into lots and blocks, intersected by streets and alleys, and places said plat on record, and sells any of the lots with reference to such plat, or when he sells with reference to the map, he thereby completely and irrevocably dedicates the streets and alleys to the use of the public, and the purchasers of such lots acquire, as appurtenant to their lots, every easement, privilege, and advantage which the map or plat represents as belonging to them. The right thus passing to the purchasers is not the mere right that the purchaser may use the streets according to their appropriate purposes, but a right vests in the purchasers that all persons whomsoever— the public—may so use them; in other words, that the streets indicated on such

map or plat shall be forever open to the public use, free from all claims or interference of the proprietor inconsistent with such use. Oswald v. Grenet, 22 Tex. 94; Lamar County v. Clements, 49 Tex. 347; City of Kaufman v. French (Tex. Civ. App.) 171 S. W. 831, 834; Martinez v. City of Dallas, 102 Tex. 54, 109 S. W. 287, 113 S. W. 1167; City of Corsicana v. Zorn, 97 Tex. 317, 78 S. W. 924.

[3] It is undisputed that Janes and his wife knew of the map of the "Silver City addition" made by Kinard. They knew of the laying out of the land into lots and blocks, with streets and alleys, as shown by said map. They knew that several persons had purchased, paid for, improved, and were living upon lots in said addition, taking deeds thereto, referring to said map for description, and upon the faith that such streets would be left open, or would be opened when the growth of the addition demanded it and the public interest required. All this they not only knew, but had agreed to in advance, selling the land to Kinard for that purpose. When they received the land back from Kinard, they not only had all this information, but they ratified all Kinard's acts in making the land into said addition and in selling lots as per said map, and also contracted to carry out contracts of sale covering some 75 more lots, on each of which a cash payment had been made, and planned to continue to sell lots to others, and appointed agents for that purpose. By these acts Janes and his wife as clearly, completely, and irrevocably dedicated the streets in said addition to the use of the public as though they had themselves, in the first instance, performed the acts done by Kinard in the premises. City of Corsicana v. Anderson, 33 Tex Civ. App. 596, 78 S. W. 261, 264.

This being true, appellees cannot now be heard to disclaim their said acts and intention as manifested by said acts, and to claim said lands comprising said lots and streets and alleys as a part of their homestead, denying to the purchasers of the lots that have been sold and to the public the rights and privileges of using said streets that were passed to and conferred upon them by the said acts of appellees. Lamar County v. Clements, 49 Tex. 347; City of Corsicana v. Anderson, 33 Tex. Civ. App. 596, 78 S. W. 264. It is not contemplated by the Constitution or the law that a rural homestead shall consist in part of acreage devoted to the uses of a rural home life and in part of lots and blocks, with intersecting streets and alleys, an addition to a city, and devoted entirely to city purposes. This was the attitude of Janes' two tracts of land at the time the execution was levied on one of the tracts and it was sold under execution to appellant O'Fiel. So, as we have said above, the acts of Janes and his wife, shown by the undisputed evidence, constituted an abandonment of the

40-acre tract as a part of their homestead, as a matter of law.

[4] We think that the court erred in refusing to give appellants' requested instruction for an instructed verdict in their favor for the further reason that, after the land had been sold to appellant O'Fiel under execution, when Janes and O'Fiel were attempting to adjust whatever differences there might exist or come up between them by reason of O'Fiel's purchase of the land at execution sale, by mutual agreement and for the purpose of settling the controversy between them, they divided the land; Janes getting the upper or north half of the tract, and O'Fiel getting the lower or south half of the tract, each executing and delivering to the other his deed therefor. Janes' deed to O'Fiel conveyed blocks Nos. 14, 15, 16, and 17 and the south half of blocks 12 and 13, describing same by lots and blocks, as shown by the recorded plat of said addition. This was a voluntary settlement by them of the matters in issue, founded upon a valuable consideration and binding upon the parties. Camoron v. Thurmond, 56 Tex. 22–34; Little v. Allen, 56 Tex. 133–138; Gilliam v. Alford, 69 Tex. 267; 6 S. W. 757; Pegues v. Haden, 76 Tex. 94–99, 13 S. W. 171; Peaslee v. Walker, 34 Tex. Civ. App. 297, 78 S. W. 980; Bartlett Oil Mill Co. v. Cappes, 54 Tex. Civ. App. 354, 117 S. W. 485; Fontaine v. Davis & Powell (Tex. Civ. App.) 164 S. W. 386–390; Davenport v. Shepherd (Tex. Civ. App.) 197 S. W. 729 (writ refused); 6 A. & E. Enc. Law (2d Ed.) 713.

[5] But appellees contend that this settlement between Janes and O'Fiel was of no effect, for in that the land conveyed to O'Fiel by Janes was a part of the homestead of Janes and wife, and as Janes' wife did not join him in the deed to O'Fiel, the deed to O'Fiel passed no title. The undisputed evidence showing that at the time the land was sold under execution Janes and his wife had abandoned the land as a part of their homestead, it was not necessary for Janes' wife to join him in the settlement deed. Moreover, after appellees had sued O'Fiel and his vendees for the recovery of the land deeded to O'Fiel by Janes in the settlement, and O'Fiel had sued Janes and wife for the recovery of the land by him conveyed to Janes in said settlement of their differences, on May 28, 1917, in order to settle their then pending lawsuits, Janes and his wife and O'Fiel made another agreement, in pursuance of which they executed another deed, conveying to each other the identical lands conveyed in the settlement first made on December 7, 1914. If for any reason the first settlement was futile, then this was a settlement of their differences and litigation, based upon a valuable consideration, and therefore binding upon the parties.

But appellees say that this cannot be true,

for the reason that, aside from the homestead question involved, the execution deed to O'Fiel conveyed no title, for the reason that the writ of execution was not based upon a final judgment in the matter in which it was issued, and the sale was therefore void, and further that the sale under execution was void for in that the writ of execution was issued on the 28th day of September, 1914, and was made returnable on the 28th day of December, 1914, more than 90 days after its issuance, and was levied on the land on the 9th day of November, 1914, and the sale made on the 1st day of December, 1914, and because there was a term of the court out of which the execution issued which began on the first Monday in October, 1914, and another term which began on the first Monday in December, 1914, from all of which it appears that the sale was made after two terms of the court had intervened, and also that the execution was, by its terms, returnable 91 days after its issuance, when under the law it could not be made returnable in a longer period of time than 90 days, and therefore the return day named in the writ was not one allowed by law, and hence the writ was returnable on the first day of the next, or October, 1914, term of the court after its issuance, the sale thereunder was made after the legal return day of the writ, and therefore void.

We do not deem it necessary to pass upon the questions as to the return day of the writ or the legality of the execution sale. They are not raised by any of the pleadings of appellees. Moreover, in order to support a defense of agreed settlement and passing of the deeds in question, appellant O'Fiel did not have to prove legal title by and through the execution deed. All the facts were within the equal knowledge of both parties. They voluntarily acted as they thought for their best interests to settle pending litigation.

[6, 7] In passing upon the effect of compromise settlements, no investigation into the character or value of respective claims will be made; it being sufficient that the parties thought there was a question between them. Little v. Allen, 56 Tex. 139. When a right is doubtful, or is controverted, or where the object is to avoid or settle litigation, a compromise duly executed will not be set aside by the courts if the parties acted in good faith, and there is no fraud or misrepresentation. Pegues v. Haden, 76 Tex. 99, 13 S. W. 171; Bartlett Oil Mill Co. v. Cappes, 54 Tex. Civ. App. 354, 117 S. W. 485. As was said in Camoron v. Thurmond, 56 Tex. 34:

"A supposition of right or of a doubtful right, though it often comes out that the right was on the other side, shall be binding, and the right shall not prevail against the agreement of the parties, for the right must always

be on one side or the other, and therefore the compromise of a doubtful right is a sufficient foundation of an agreement."

[8] When parties have confidence enough in their claims to stand for and litigate them, a mutual agreement for the compromise is in itself a valuable consideration. Little v. Allen, 56 Tex. 138. Judge Stayton, in Gilliam v. Alford, 69 Tex. 271, 6 S. W. 759 (quoting from Pomeroy's Equity (3d Ed.) § 850), says:

. "The rule in such cases is that 'voluntary settlements are so favored that if a doubt or dispute exists between parties with respect to their rights, and all have the same knowledge or means of obtaining knowledge concerning the circumstances involving those rights, and there is no fraud, misrepresentation, concealment, or other misleading incident, a compromise into which they have voluntarily entered must stand and be enforced, although the final issue may be different from that which was anticipated, and although the disposition made by the parties in their agreement may not be that which the court would have decreed had the controversy been brought before it for decision."

Judge Willson, in Fontaine v. Davis & Powell (Tex. Civ. App.) 164 S. W. 386–390, says:

"It is well settled that, 'in order to render valid the compromise of a claim, it is not essential that the matter should be really in doubt. It is sufficient if the parties consider it so far doubtful as to make it the subject of a compromise.' "

See, also, Davenport v. Shepherd (Tex. Civ. App.) 197 S. W. 729 (writ refused).

Davenport v. Shepherd, supra, was a suit to cancel a deed and for title and possession of a tract of land. In many of its features it was like the instant case. Davenport and Shepherd were partners in business, and Shepherd conveyed the land in controversy to Davenport, but Davenport failed to place the deed of record and lost same. Shepherd died intestate, and his wife qualified as community administratrix of his estate. Davenport, after Shepherd died, informed Mrs. Shepherd that her husband had deeded him the land, but that he had failed to place the deed of record, and had lost same, and requested her to make him a deed in her individual capacity and as administratrix of her deceased husband's estate to take the place of the lost deed, which she declined to do, disclaiming any knowledge of her husband's ever having executed any such deed. Davenport sued Mrs. Shepherd to establish the deed. Mrs. Shepherd employed an attorney and resisted the suit, and filed answer, denying plaintiff's allegations, and objected to his testifying relative to his alleged transaction with her deceased husband. The notary who it was claimed took Shepherd's acknowledgment to the deed had no

record pertaining to the transaction, and had no independent recollection of the execution of the instrument. In this state of the case, plaintiff, Davenport, and defendant, Mrs. Shepherd, entered into a compromise settlement of their pending litigation by each deeding to the other one-half of the land in controversy. After the settling of the suit by compromise, Davenport found his deed and placed same of record. The suit was brought to set aside the compromise deed, and to recover the title and possession of the half of the tract of land he had deeded Mrs. Shepherd in the compromise settlement of their first suit, on full and appropriate allegations of fraud, coercion and want of consideration to support the compromise deed sought to be cancelled, etc. Judgment was in favor of Mrs. Shepherd, the court holding that the compromise of the suit was a good and sufficient consideration for the deed and binding upon the parties. Davenport appealed the case to the Court of Civil Appeals, where the judgment was affirmed, and the Supreme Court refused a writ of error.

Appellants present several propositions urging error in the court's charge, especially to that part of the same instructing the jury that Janes and wife received the land back from Kinard as a part of their homestead, and that the land never lost its homestead character by its conveyance to Kinard, tnd to that portion relative to Janes' contract with Kinard to carry out the contracts of sale. The assignments should be sustained. The charge was not only on the weight of the evidence, but was wrong as a matter of law.

[9, 10] Appellants also complain that the court erred in refusing to permit them to prove by A. L. Leonard and several other witnesses that Janes had told them, in 1914, and prior to the filing of this suit, that he did not claim the land in question as a part of his homestead, but that he was selling same off in lots. This testimony was offered for the purpose of showing the intent of Janes, as to whether he claimed the same as a part of his homestead and intended to use same for homestead purposes, or to the contrary. The assignment is sustained. The testimony was admissible. The acts of Janes and his wife in segregating the 40-acre tract from the 15-acre tract upon which they lived, and selling it to Kinard for the purpose of its being made into a city addition; that Kinard had platted it into such addition, recorded the plat, and sold some of the lots, and contracted for the selling of 75 more of the lots, receiving a cash payment on each of them; that Kinard, being unable to carry out his contract with Janes and his wife, had reconveyed the land to them in its changed condition, they agreeing to recognize and carry out Kinard's contracts of sale; that they notified the persons holding

the contracts of purchase with Kinard that they would carry out his said contracts of sale; that they appointed agents to continue the sale of lots in said addition; and that they had not made or attempted to make any use of the land for homestead purposes—were all in evidence. It is well settled that where intention is the subject of inquiry, and acts are admitted in evidence, declarations accompanying such acts and explanatory of them are always admissible. Gunn v. Wynne (Tex. Civ. App.) 43 S. W. 294 (writ denied); Thigpen v. Russell, 55 Tex. Civ. App. 211, 118 S. W. 1080 (writ denied); Woolfolk v. Ricketts, 48 Tex. 37; Jacobs, Bernheim & Co. v. Hawkins, 63 Tex. 1; Tuerpe v. Live Stock Commission (Tex. Civ. App.) 245 S. W. 742; Sproul v. Bank (Tex. Civ. App.) 246 S. W. 1081.

[11] Appellants also complain that the court erred in his charge submitting the question of whether appellant O'Fiel, in his settlement of the pending lawsuits with Janes and wife, paid to them "a fair and adequate consideration" for the land they conveyed to him on May 28, 1917, insisting that, if the issue should have been submitted to the jury at all, the court should have charged the jury that a "valuable consideration" was the measure. The assignment is sustained. This was not a case of ordinary purchase, but that of the compromise of a contested claim as to ownership of property. It was a compromise settlement entered into by the parties, and a valuable consideration was all that was necessary to support the conveyance. It is well settled that "a mutual agreement for compromise is in itself a valuable consideration." Little v. Allen, 56 Tex. 138; Scott v. Lott (Tex. Civ. App.) 247 S. W. 687. Moreover, the jury found that O'Fiel paid to Janes and wife $10 in cash and released to them the judgment against Janes in the sum of $435, which he (O'Fiel) had discharged in purchasing and paying for the land at execution sale.

[12] Appellants urge that the court erred in submitting issue No. 4 to the jury. This issue is:

"Do you find that at the time David E. O'Fiel filed the suit against Zeke Janes and wife in the Fifty-Eighth district court to recover blocks 8, 9, 10, 11, and the north half of blocks 12 and 13, he, being a lawyer and acquainted with all the facts, in good faith believed on probable cause that he had a right to recover the lands sued for?"

We think the assignment should be sustained. In the first place, we do not think the issue of "good faith" on the part of O'Fiel was raised by the evidence; but, if so, then the charge was argumentative and prejudicial to appellants.

Other propositions are presented, but we shall not discuss them. From what we have said, it follows that the case should be reversed, and, because of our holdings on the questions of abandonment and compromise settlement, that judgment should be here rendered for appellants; and it is so ordered.

Reversed and rendered.

HIGHTOWER, C. J. I agree with the conclusions reached by Judge O'QUINN on the questions discussed by him in the foregoing opinion; but, since these views are at variance with what this court held on the former appeal, in an opinion written by Judge WALKER, I will state very briefly why I have changed my opinion on the main question involved—that of abandonment of a part of their rural homestead by Janes and wife.

On the former appeal, whilst I tried to acquaint myself with all the facts relevant to the question of abandonment of a part of their rural homestead by Janes and wife, I failed to do so as thoroughly as I should. On the present appeal, I have, I think, analyzed and properly weighed all the facts and circumstances bearing upon this question, as the same are stated in Judge O'QUINN'S opinion, and I cannot now escape the conclusion that these facts and circumstances show an abandonment by Janes and wife of the 40 acres called the "Silver City addition" as a matter of law.

In the second place, on the question of abandonment, I failed on the former appeal to grasp and apply the distinction between that line of authorities touching the abandonment of a rural homestead, where a municipality, without the consent of the owner of the rural homestead, had extended the corporate limits of the municipal corporation, so as to include the rural homestead of one not consenting thereto, and that line of decisions touching the question of the abandonment of a part of the rural homestead by its owner of his own volition. I find, upon closer scrutiny of these two lines of authority, that there is a vast distinction in these respects, as I think is manifest from the authorities cited and discussed in Judge O'QUINN'S opinion.

I have therefore concluded that upon the undisputed facts in this case, showing the acts and declarations of Janes and wife touching the 40 acres cut off and designated as the "Silver City addition to the city of Beaumont," they, beyond all doubt, intended to abandon and did abandon that much of their once rural homestead, and that no part of this 40 acres was ever afterwards stamped with the homestead character.

WALKER, J. (dissenting). A former appeal of this case is reported in 220 S. W. 371, David E. O'Fiel v. Zeke Janes, but my brethren have not referred to that opinion, nor discussed it though the case went to the

Supreme Court on petition for writ of error, which was refused. As I understand the opinion of my brethren, they have overruled our former opinion in two respects:

(1) They now hold that the evidence on this appeal, as a matter of law, establishes an abandonment by Zeke Janes and wife of their homestead claim to the land in controversy. As I understand, the facts on this appeal are practically identical with the facts on the former appeal, where we held that this question was one of fact.

(2) They now hold that the executory sale by Zeke Janes and wife of the land in controversy to Kinard, as a matter of law, destroyed the homestead rights of Zeke Janes and wife in the land so conveyed, and that they could acquire a new homestead claim to the same only by a rededication of it to homestead purposes. On the former appeal, we held that the sale did not constitute an abandonment of the homestead claim.

To some extent, at least, the two propositions on which my brethren have overruled our former opinion were involved in the petition for writ of error sued out in this case, and to some extent must have been considered by the Supreme Court in refusing the writ. Believing that the case was correctly decided on the former appeal, I most respectfully dissent from these conclusions now announced by my brethren.